**IN THE COURT OF APPEALS OF IOWA**

No. 14-0893
Filed October 28, 2015

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**BRIAN EARL LEBS,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Scott County, Mark D. Cleve,

Judge.


        Brian Lebs appeals his convictions after a jury found him guilty of second-

degree arson and insurance fraud.  **AFFIRMED.**


        Mark C. Smith, State Appellate Defender, Martha J. Lucey, Assistant

Appellate Defender, and Angela J. O'Kane, Legal Intern, for appellant.

        Thomas J. Miller, Attorney General, Kevin Cmelik and Heather Ann

Mapes, Assistant Attorneys General, Michael J. Walton, County Attorney, and

Kimberly Shephard, Assistant County Attorney, for appellee.


        Considered by Bower, P.J., and McDonald, J., and Scott, S.J.*

**BOWER, Presiding Judge.**

Brian Lebs appeals his convictions after a jury found him guilty of second-degree arson, in violation of Iowa Code section 712.3 (2013), and insurance fraud, in violation of section 507E.3. He claims there was insufficient evidence to support his conviction, the district court abused its discretion in allowing certain witnesses to testify, and his trial counsel was ineffective. We affirm.

## I.    BACKGROUND FACTS AND PROCEEDINGS

At approximately 9:35 a.m. on November 17, 2012, the Davenport Fire Department responded to a fire at Lebs's house. Upon entering the home, the firefighters discovered the fire was in the basement. The firefighters extinguished the fire but not before the interior of the home was damaged. At the time of the fire, Lebs owed $1600 in past due payments on the house, which he had purchased on contract. On November 2, the holder of Lebs's home contract had sent him a letter setting a deadline of November 16 to remedy the deficit.

In the days prior to the fire, Lebs and his wife, Sandra, had noticed the smell of natural gas in their home. Lebs called MidAmerican Energy to have a technician investigate the potential gas leak. A technician visited the home on November 14 and determined the pipe connected to the hot water heater was leaking gas. The technician only discovered the leak through the use of a detector and did not report smelling gas. The technician turned off the gas to the hot water heater and placed a "Hazardous Notice Tag" on the heater to indicate there was a gas leak and it was in need of service. The technician also capped a valve leading to the clothes dryer, which was also leaking. Lebs had previously

disconnected the dryer from the gas line. Further inspection of the pipes revealed no other leaks. The technician informed Lebs the hot water heater should not be used until the leak was fixed.

On November 16, around 4:00 p.m., Lebs noticed a "huge aroma of gas." Lebs again called MidAmerican. A different technician investigated and determined the furnace was leaking gas. The furnace cover was off, which the technician thought seemed odd. The technician turned off the gas to the furnace. The technician told Lebs to open the windows to vent the gas from the house and not to use the stove to heat the house.

That night, the Lebs's five children stayed at Sandra's parent's house. Lebs and Sandra spent the night at home. The next morning (the day of the fire) the couple left the house between 7:45 a.m. and 8:45 a.m. They left the house in separate vehicles; Lebs left after Sandra. Later that morning, a neighbor noticed smoke emitting from the Lebses' home and called the fire department.

Immediately after the fire was suppressed, fire cause specialist Michael Ryan investigated and determined the origin of the fire was the basement. He ruled out electricity as the cause of the fire. He also noted none of the basement appliances were the cause of the fire. Unable to determine how the fire started, Ryan called firefighter Kurt Blackburn, a fire "origin and cause specialist" and Lieutenant James Morris to investigate.

Blackburn surveyed the exterior of the house and found "smoke staining" around the gas meter where smoke had been "pushing out from around the actual gas meter." Upon entering the house, he noticed the damage caused to

the first floor was minimal. He then went to the basement and observed a cabinet "that was completely consumed by fire." He scrutinized the electrical outlets near the cabinet and concluded they were not the cause of the fire. Ultimately Blackburn was unable to conclude "the actual ignition source, in terms of what started the fire, as well as knowing the fuel, in terms of how the fuel and the ignition source came together," he ruled that as "undetermined." He noted:

> Each fire actually tells a story.
>
> . . . .
>
> This fire story told me that there was no ignition sources in that area, that I can tell. There was no initial fuel that would have started, and because I can't put those two together, I had to rule the fire as undetermined. But at the same time there is a strong possibility that this could be an intentionally set fire.
>
> . . . .
>
> Because I couldn't determine that the fire—how it started and what the initial fuels were, I had to rule it as undetermined, but there was items that were suspicious of it. There was—made it suspicious. One was that during our investigation, our dual investigation, Lieutenant Morris found a stove upstairs with two of the burners in the high position, as well as the oven itself turned to 325.

Morris arrived at the house approximately one hour after the fire. After being unable to determine the "source of ignition" of the fire, Morris looked at the other possible causes. Morris traced the gas lines to determine whether any appliances were turned on. He discovered the kitchen stove (on the first floor of the house) had two burners turned on and set to high, the oven was also turned on. Morris noticed two pots with plastic and rubber combustible handles were inside the oven.

After Morris concluded his investigation of the home, Morris conducted an interview with Lebs. Lebs told him the basement was the children's playroom

area—though Morris did not observe any toys in the basement. Lebs (inaccurately) stated he was only one month behind on house payments, though he had been working with the mortgage holder, Little River Investments, to catch up on his payments. Lebs denied using the stove the night before or the day of the fire. Lebs also stated he had been unemployed for about two weeks, but he had obtained employment in North Dakota and was planning on leaving Iowa the day of the fire for the employment. After months of additional investigation, Morris concluded the fire had been intentionally set. He stated:

> The fire was set while—in the basement, which in my training and experience in set fires, it takes a lot more time to detect a fire that's down below grade, down below level there. The fact that there is no ignition source in the area. There should be some explanation. There was no electrical, there was no gas in that area. All the appliances were isolated and shut off by MidAmerican prior to this fire, except for the gas stove. And then also finding the gas stove in the on position, with two burners and the oven, no pots to speak of around that area, is what led us to believe that.
> . . . .
> [The ignition source] went in his pocket with him or was destroyed.

MetLife Insurance Company provided the homeowner's insurance for Lebs's house. Lebs initially received a $3000 debit card to help cover immediate expenses from the fire. Lebs also received $975 for rent and $1258 for cleanup costs. Martin Sigsworth investigated the fire for MetLife. Sigsworth noted the value of the insurance "policy was worth significantly more than the value of the home." The Lebses' policy listed $268,000 for dwelling coverage, $187,740 for personal property, and $67,000 for loss-of-use insurance. Lebs had contracted with Little River to purchase the home for $78,000 and put $5000 as down payment. The home's value was estimated at $100,000. As the holder of the

insurance policy, Lebs would have been the first person to receive payment for damage done to the house.

Sigsworth interviewed Lebs on December 2. Sigsworth asked him general questions about his background, employment history, and financial circumstances. While discussing Lebs's employment, Lebs noted he had been hired in North Dakota but had not obtained the position until a couple weeks after the fire (which conflicts with what Lebs told Morris). With regards to Lebs's previous residences, Lebs noted he had a mortgage on a house located in Missouri. Even though Lebs and his wife were ahead on their mortgage payments and they likely had equity in the house, they inexplicably walked away from the home without trying to sell. The couple put "quite a bit of money into it," but the documentation from the work done to the Missouri house was destroyed in the house fire. Based on his full investigation, Sigsworth denied Lebs's insurance claim.

On April 4, 2013, the State charged Lebs with second-degree arson and insurance fraud. A jury trial was held on March 31 through April 2. The jury returned a verdict of guilty on both counts. A sentencing hearing was held on May 31, 2014. Lebs was sentenced to a period of incarceration not to exceed ten years for the arson charge, and a period of incarceration not to exceed five years for insurance fraud. The court ordered the sentences to run concurrently. Lebs's request for probation was denied due to his criminal history and the number of people he put in harm's way. Lebs now appeals.

## II. STANDARD OF REVIEW

We review sufficiency-of-the-evidence claims for a correction of errors at law. *State v. Edouard*, 854 N.W.2d 421, 431 (Iowa 2014). In deciding whether the evidence is sufficient to support a guilty verdict, we consider the record evidence in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from that evidence. *State v. Showens*, 845 N.W.2d 436, 439–40 (Iowa 2014). If substantial evidence supports the verdict, we will uphold it. *Id.* at 440.

We review the admission of objected to testimony for an abuse of discretion. *See State v. Brown*, 856 N.W.2d 685, 688 (Iowa 2014). The district court abuses its discretion when it exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable. *Id.* "A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law." *Id.*

A defendant may raise an ineffective-assistance claim on direct appeal if he has reasonable grounds to believe the record is adequate for us to address the claim. *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006). If we determine the record is adequate, we may decide the claim. *Id.* We review claims of ineffective assistance of counsel de novo. *Id.* This is our standard because such claims have their basis in the Sixth Amendment to the United States Constitution. *State v. Clay*, 824 N.W.2d 488, 494 (Iowa 2012).

## III.    DISCUSSION

### A.    Sufficiency of the Evidence

Lebs claims there is not sufficient evidence to prove he knowingly caused the fire that damaged his home and knowingly submitted false information to his insurance company with the intent to defraud.

The jury was instructed in order to find Lebs guilty of second-degree arson the State had to prove the following elements: "1. On or about the 17th day of November 2012, the Defendant caused a fire in or near property.  2. The Defendant intended to destroy or damage the property or knew the property would probably be destroyed or damaged.  3. The property was a building."  The jury received the following instruction defining "intent":

> To commit a crime a person must intend to do an act which is against the law.  While it is not necessary that a person knows the act is against the law, it is necessary that the person was aware they were doing the act, and they did it voluntarily, not by mistake or accident.  You may, but are not required to, conclude a person intends the natural results of their acts.

Substantial evidence shows the fire was intentionally set.  Fire investigators Blackburn and Morris reached the same conclusion.  While Blackburn initially ruled the cause of the fire "undetermined," he later explained this was because he could not locate the actual ignition source or determine the fuel.  He concluded there was a strong possibility that this could have been an intentional fire.  Morris ruled the fire was "incendiary" after additional investigation.

Additionally, the evidence establishes Lebs was responsible for the fire this includes: the fact Lebs and his wife stayed at their home the night preceding

the fire and he was the last to leave the home, the conflicting reasons why he and his wife drove two cars that morning, Lebs's characterization of the basement as the children's play area even though no toys where found there, the fact the furnace cover had been removed while Lebs told the insurance company it had not been taken apart, Lebs's troubling financial situation and his misstatement of the status of his house payments, Lebs's misstatement of his employment status, Lebs's past issues with housing, and the substantial amount of insurance money Lebs would have received for the fire damaged home.

Reviewing the evidence in the light most favorable to the State, we find substantial evidence supports the verdict Lebs caused the fire in his home. Accordingly, sufficient evidence supports both his arson and insurance fraud convictions.

### B.     Objection to Morris Testimony

Lebs claims the district court abused its discretion by allowing expert witness Morris to testify regarding his opinion about the cause of the fire and thus admitted inadmissible expert testimony that spoke to Lebs's guilt or innocence. The State claims Lebs has failed to preserve error on this claim.

The following exchange occurred with regards to Morris's testimony:

> Q:  Based on your entire investigation, all the things that we have heard that you did—visited the scene, interviewed witnesses, interviewed the Defendant, examined the stove, obtained financial documents—did you form an opinion about the cause of the fire?
> A:  I did.
> Q:  What is your opinion?
> Defense Counsel:  I'll object to that question, your honor.  It calls for the ultimate conclusion that should be left up to the jury.
> The Court:  That objection is overruled.

Q: What is your opinion? A: That this fire was intentionally set.

Q: Tell us how that could have happened. A: The fire was set while—in the basement, which in my training and experience in set fires, it takes a lot more time to detect a fire that's down below grade, down below level there. The fact that there is no ignition source in the area. There should be some explanation. There was no electrical, there was no gas in that area. All the appliances were isolated and shut off by MidAmerican prior to this fire, except for the gas stove. And then also finding the gas stove in the on position, with two burners and the oven, no pots to speak of around that area, is what led us to believe that.

Q: Where did the ignition source go? A: Went in his pocket with him or was destroyed.

Iowa Rule of Civil Procedure 5.704 provides that expert "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." However, "a witness cannot opine on a legal conclusion or whether the facts of the case meet a given legal standard. Such an opinion would be of no value to the jury. In most cases, the jurors are fully capable of applying the facts of the case to the law. . . ." *In re Det. of Palmer*, 691 N.W.2d 413, 419 (Iowa 2005).

"It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Lamasters v. State*, 821 N.W.2d 856, 862 (Iowa 2012) (citing *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002)). We find defense counsel's objection was insufficient to preserve error for this claim on appeal. Defense counsel's objection was properly overruled since Iowa Rule of Civil Procedure 5.704 allows an expert to opine about an ultimate issue. To preserve error for this appeal, defense counsel should have stated the prosecution's "question called for a legal conclusion, for an opinion that was not the proper subject of

expert testimony . . . or for an opinion whose probative value would be substantially outweighed by the danger of misleading the jury." *Palmer*, 691 N.W.2d at 422. Defense counsel "was required to identify the specific legal terms that rendered the question objectionable." *Id.*

Even if error had been preserved, the result would have been the same. Morris's testimony the ignition source "[w]ent in his pocket with him or was destroyed" went beyond permissible expert testimony on the cause and origin of the fire and constituted an impermissible opinion regarding the defendant's guilt. *See State v. Myers*, 382 N.W.2d 91, 94 (Iowa 1986) ("Both matters, credibility of a witness and the determination of the guilt or innocence of the accused, are reserved solely for the fact finder."). Morris specifically offered his opinion it was "him," the defendant, who was the arsonist. That was a question for the jury. *See Juilian v. State*, 811 N.E.2d 392, 400 (Ind. Ct. App. 2004) (holding investigator could provide opinion fire was intentionally set but not provide opinion it was the defendant who set the fire); *State v. Campbell*, Nos. C-010567 & C-010596, 2002 WL 398029, at *6 (Ohio Ct. App. Mar. 15, 2002) (holding it was improper for fire investigator to identify the defendant as starting fire as an impermissible opinion on guilt). However, the error was harmless in light of the remainder of the evidence. *See* Iowa R. Evid. 5.103(a) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected."); *State v. Parker*, 747 N.W.2d 196, 210 (Iowa 2008) (holding error harmless based on "overwhelming evidence of guilt").

### C.    Ineffective Assistance

Lebs claims his trial counsel provided him with ineffective assistance by failing to object to the interview transcript between Lebs and the insurance investigator, and by failing to object to the insurance investigator's testimony. Upon our review of the record, we find it inadequate to address Lebs's ineffective-assistance-of-counsel claims on direct appeal and preserve these claims for potential postconviction-relief proceedings. *See Straw*, 709 N.W. 2d at 133; *see also State v. Coil*, 264 N.W.2d 293, 296 (Iowa 1978) ("Even a lawyer is entitled to his day in court, especially when his professional reputation is impugned.").

## IV.    CONCLUSION

Substantial evidence supports the jury's verdict finding Lebs guilty of arson and insurance fraud. We find Lebs failed to preserve error on his claim concerning Morris's expert testimony, and if error was preserved, Morris's testimony, while inadmissible, was harmless error. Finally, we preserve Lebs's ineffective-assistance claim for postconviction-relief proceedings to allow for further development of the record.

**AFFIRMED.**